ASSOCIATED PERFUMERS, INCORPORATED, *vs.* ABE ANDELMAN
& another.

Suffolk.    May 13, 1943. — May 2, 1944.

Present: FIELD, C.J., LUMMUS, QUA, DOLAN, RONAN, & WILKINS, JJ.

*Name. Restraint of Trade. Unlawful Interference. Unfair Competition. Contract,* Validity, Trade name, Restraint of trade, License contract. *Damages,* For breach of contract.

A contract licensing a manufacturer of articles usually offered for sale in drug stores to use in the operation of retail stores the trade name and a distinctive store front and methods of merchandising and display used and developed by and associated with the name of the licensor, who operated a chain of retail cut-rate stores and was the originator of the cut-rate chain store method of distribution of such products, and to grant the same right to sublicensees subject to an agreement as to price maintenance; and a contract of the licensee granting such right to a sublicensee subject to the provision as to price maintenance and a provision requiring him to carry in his store only goods of the licensee and listed competing brands of substantially all articles of wide sale and distribution in the trade, were not ineffectual as attempting to assign the trade name in gross, and were not invalid as in restraint of trade in violation of G. L. (Ter. Ed.) c. 93, § 1, or at common law; and the sublicensee, after breach by him for which his contract was terminated by the licensee, properly was enjoined in a suit by the licensee from further use of such trade name or representing that wares in his store were goods generally offered for sale in the type of stores originated by the licensor, and from making representations either within or on the outside of his store tending to induce purchasers using ordinary care to trade with him in the belief that his store was such a store or that he was in some way connected with the licensor or the licensee; but he was improperly enjoined from use of the licensor's type of store front and methods of merchandising.
In a suit in equity involving as one issue breach by the defendant of a contract requiring him to purchase from the plaintiff at least a certain amount of goods, the plaintiff was entitled to a decree ordering payment to him by the defendant of a sum which it was found would have been the plaintiff's profit if the defendant had performed the contract.

BILL IN EQUITY, filed in the Superior Court on September 22, 1941.

From interlocutory and final decrees entered by order of *Fosdick,* J., the defendants appealed.

The case was argued in this court before *Field*, C.J., *Donahue, Qua, Dolan,* & *Cox,* JJ., and after the retirement of *Donahue* & *Cox,* JJ., was submitted on briefs to *Lummus, Ronan,* & *Wilkins,* JJ.

*J. L. Yesley,* (*S. Andelman* with him,) for the defendants.

*S. C. Rand* & *C. Lee,* for the plaintiff.

DOLAN, J.   This is a bill in equity to enjoin the defendant Abe Andelman from engaging in business in violation of a written agreement between him and the plaintiff, and to recover damages from him and also from the other defendant, Max Miller, under a contract of guaranty.   The defendants demurred to the bill of complaint and appealed from the overruling of the demurrers.   The grounds of the demurrers are that the defendants were improperly joined in the suit; that the bill sets forth no ground for equitable relief, sets forth no claim with sufficient definiteness and is verbose and argumentative; and that the plaintiff has an adequate remedy at law.

The case was referred to a master who incorporated the pleadings in his report.   The relevant facts found by him are these: The plaintiff is a Connecticut corporation having a usual place of business in New Haven, Connecticut.   It is engaged in the manufacture and wholesale distribution of branded drugs, medicines, cosmetics, and other articles usually offered for sale in drug stores, which articles it distributes in Massachusetts and in not less than thirteen other Atlantic seaboard States, and in the District of Columbia.   In 1933 the plaintiff entered into a written contract with the Carroll Company, a Connecticut corporation, which operates a chain of retail cut-rate stores in the area above mentioned and sells therein at retail the wares manufactured and distributed by the plaintiff.   The Carroll Company was the originator of the cut-rate chain store method of distribution of the products in question; it developed a distinctive store front and methods of display and merchandising which have been effective and have given the Carroll Company and its name a place of distinction in the retail patent medicine and cosmetic business.   By the contract between the Carroll Company and the plaintiff, the Carroll Company

licensed the plaintiff itself to operate or to grant to others sublicenses to operate "Carroll Dealer" retail stores employing the name "Carroll" in conjunction with the word "Dealer," and to employ the Carroll Company's distinctive store front, display and merchandising methods. The contract bound the plaintiff to exact of sublicensees an agreement that, when the Carroll Company should be required by any manufacturer whose products it sold in its own stores to maintain a minimum retail price on any items, the sublicensees should maintain the same retail price.

On May 27, 1938, the plaintiff entered into a written contract with the defendant Andelman granting him an exclusive license to operate a retail store in Winchester, Massachusetts, as a "Carroll Dealer," using the name "Carroll" with the word "Dealer," and the aforementioned distinctive store front, methods of display and merchandising. The contract bound the defendant Andelman to purchase from the plaintiff $1,800 worth of its products or an amount equal to seven and one half per cent of his total retail sales per year; to carry only the plaintiff's products and those competing brands listed in a "Grey Book" issued by the plaintiff, and no others; and to maintain the same prices on any items that the Carroll Company might be required to maintain in its stores by other manufacturers. The contract authorized the plaintiff to terminate the arrangement upon two weeks' notice in writing if the defendant Andelman should fail to purchase his stipulated quota of the plaintiff's products, and to terminate it forthwith upon written notice in the event of any other breach. In the event of termination of the contract for any reason, the defendant Andelman covenanted not to engage directly or indirectly in the manufacture, sale, or distribution of drugs, cosmetics, patent medicines, or the like, for two years after the termination of the agreement, in Maine, New Hampshire, Vermont, Massachusetts, Rhode Island, Connecticut, New York, New Jersey, Delaware, Maryland, Pennsylvania, Virginia, West Virginia, Kentucky, Indiana, the District of Columbia, and Florida, or in any town in any State in which the Carroll Company or a "Carroll Dealer" might at such time be

conducting a general retail cosmetic or patent medicine business. The contract was identical with contracts entered into between the plaintiff and about two hundred thirty-three other individuals and firms or corporations in the eastern portion of the United States.

The bill alleges that the defendant Andelman failed to purchase his agreed quota of merchandise; that he bought and sold products not contained in the "Grey Book" despite complaints by the plaintiff and repeated promises by Andelman; and that he violated the price maintenance agreements despite complaints by the plaintiff and promises by Andelman. The bill further alleges, and the master found, that on August 4, 1941, the plaintiff sent Andelman a written notice of its intention to terminate the contract effective August 20, 1941, but that the defendant had continued after the latter date and was continuing to hold himself out to the public as a "Carroll Dealer," using the Carroll colors, store front, signs and displays and the Carroll name in the operation of his Winchester retail store.

The master also made the following findings: During the calendar years of 1939 and 1940 Andelman failed to purchase his agreed quota of merchandise from the plaintiff. On several occasions he sold certain items at prices less than the Carroll Company was required to maintain under the "Fair Trade" law, despite complaints by the plaintiff and promises by Andelman. Between February, 1939, and August 1, 1941, Andelman purchased some $500 worth of merchandise not contained in the "Grey Book," some of which he sold. On complaint by the plaintiff in November, 1939, he promised to refrain from such practice in the future, which promise was not made in good faith and was not kept. The "Grey Book" contained a list of substantially all articles of merchandise of wide sale and distribution in the drug and cosmetic business. Its purpose was to confine Carroll dealers to known articles and thus prevent them from dealing in unknown and inferior goods to the detriment of the Carroll system and Carroll dealers. There were sixty-eight Carroll franchise dealers in Massachusetts, thirty-three of whom were in the Greater Boston area. In

addition, there were eleven stores owned and operated by the Carroll Company in the Commonwealth. The plaintiff did about four tenths of one per cent of the total annual dollar value of the cosmetic business done in Massachusetts. Andelman's violations of his contract were known generally to other Carroll dealers in Massachusetts who complained to the plaintiff and threatened to do likewise if he was not stopped. To permit him to carry on as a "Carroll Dealer" would tend to promote unrest among authorized dealers in the area and tend to break down the entire system as well as to injure the good will of the plaintiff and of the Carroll Company.

Prior to entering into the contract in issue Andelman had been employed in other cut-rate stores, including a "Carroll Dealer" store operated by his sister, and had been manager of two of the stores in the Allen chain, a firm whose methods of operation are similar to those of the Carroll system, so that the Carroll methods were well known to him as well as to many others.

Based on figures of other dealers similarly located, Andelman for the remainder of the year 1941 should have purchased from the plaintiff about $1,116.67 worth of goods, on which the plaintiff's profit, approximately forty-five per cent, would have amounted to $502.50. From August 20, 1941, to January 10, 1942, the last business day before the hearings, Andelman "either made a profit, or, without regard as to whether it was profit, extracted from said business" for his own use $2,475.88. Andelman owes the plaintiff the sum of $22.16 for merchandise bought of the plaintiff before August 20, 1941. The plaintiff claims no damages on account of injury to its good will or that of the Carroll Company, and consequently none was assessed.

The plaintiff prays for an injunction restraining Andelman from using the Carroll Company's type of store front, store interior, and merchandise display; from holding himself out to the public as a "Carroll Dealer"; from passing off the merchandise of other manufacturers as products of the plaintiff and as products generally found in Carroll stores; from engaging directly or indirectly in the manufacture, sale, or distribution of drugs, cosmetics, and the

like, anywhere in the Commonwealth, or in such portions as the court deems equitable; and for damages from Andelman and from the guarantor Miller. An amended answer of the defendants alleges that the agreement and its restrictive covenant are against public policy and unreasonably in restraint of trade and are void; that there is lacking mutuality of obligations; and that there has been a failure of consideration on the part of the plaintiff and the Carroll Company. The master found these allegations untrue in so far as they be questions of fact.

The defendants filed three objections to the master's report and, at their request, the master summarized the evidence pertinent thereto, a stenographer having been appointed before the hearings. An interlocutory decree was entered denying the motions of the parties to recommit the master's report, overruling the objections (exceptions) thereto and confirming the report. The defendants appealed from this decree. A final decree was entered in which the defendant Andelman was permanently enjoined from making use of the Carroll Company's type of store front, store interior and merchandise display; from holding himself out to the public as a "Carroll Dealer"; and from passing off as products of the plaintiff and as goods found only in Carroll stores merchandise manufactured by others than the plaintiff. Andelman was further enjoined until August 20, 1943, two years from the date of termination of the contract, from engaging in the sale of drugs, cosmetics, and kindred articles, within the cities and towns of Winchester, Arlington, Lexington, Stoneham, Woburn, and Medford, Massachusetts. He was ordered to pay to the plaintiff the sum of $524.66, said sum being composed of $502.50 — the profits the plaintiff would probably have realized on the contract for the remainder of 1941 — and $22.16 owed the plaintiff for goods purchased prior to the termination of the contract. The defendant Miller was ordered to pay the above amount to the plaintiff if, within sixty days, Andelman had not already done so, and in that event it was ordered that he be subrogated to the rights of the plaintiff against Andelman. Each of the defendants appealed.

We think that a reading of the contract of guaranty requires the construction that all that the defendant Miller undertook to guarantee was the plaintiff's merchandise account with Andelman not exceeding $1,000, and that the breaches set forth in the bill do not fall within the fair intendment of the guaranty. See *L. Littlejohn & Co. Inc.* v. *Handy*, 246 Mass. 370, 374, and cases cited.

There was error in including within the damages awarded to the plaintiff by the final decree the sum of $22.16 for merchandise purchased from the plaintiff by Andelman, for the bill alleges no such debt and there is no prayer in this respect. No relief may be granted that is not within the scope of the bill. *Perry* v. *Pye*, 215 Mass. 403, 413. *Baker* v. *Langley*, 247 Mass. 127. *Drury* v. *Hartigan*, 312 Mass. 175, 177, and cases cited.

The third objection to the master's report, concerning his finding of the amount of money extracted by Andelman from his own business for his own use from August 20, 1941, to the commencement of the hearings before the master, need not be considered, since this figure was not used in computing and awarding damages.

The propriety of the injunction against engaging in the retail drug and cosmetic business in the proscribed area for a period of two years from August 20, 1941, need not be discussed, for that period has already elapsed. The final decree must be modified in this respect.

We do not sustain the contention of the defendant Andelman that the license given by the Carroll Company to the plaintiff and the sublicense by the plaintiff to him is void. The argument is rested upon the established proposition of law that a trade name can have no existence in gross or be the subject of assignment apart from the product or business with which it has become identified. *Chadwick* v. *Covell*, 151 Mass. 190. *Weener* v. *Brayton*, 152 Mass. 101, 103. *Covell* v. *Chadwick*, 153 Mass. 263, 267. *Jackman* v. *Calvert-Distillers Corp.* 306 Mass. 423, 426. But a trade name may be assigned as long as it remains associated with the same product or business with which it has become associated in the minds of the public. *Hoxie* v. *Chaney*, 143

Mass. 592. *Canadian Club Beverage Co.* v. *Canadian Club Corp.* 268 Mass. 561, 568. *California Wine & Liquor Corp.* v. *William Zakon & Sons, Inc.* 297 Mass. 373, 378. And this is so although both the Carroll Company and the plaintiff have assigned only a part of their business with the trade name. *California Wine & Liquor Corp.* v. *William Zakon & Sons, Inc.* 297 Mass. 373, 378.

We do not concur in Andelman's argument that the provision of the contract requiring him to deal only in goods carried in Carroll Company stores is an illegal restraint of trade both under G. L. (Ter. Ed.) c. 93, § 1, and at common law. That statute prohibits sales on condition that the purchaser shall not deal in the goods of any competitor. "It refers to dealings which make it impossible for one to buy certain goods to sell again, unless he agrees at the same time to sell them exclusively." *Commonwealth* v. *Strauss,* 188 Mass. 229, 231. "We may infer that the Legislature was providing for cases in which this particular kind of contract would be unfair competition as against weaker dealers, and would be injurious to the public as tending to crush ordinary competitors, and thus create a monopoly, from which the community as consumers would ultimately suffer." *Commonwealth* v. *Strauss,* 191 Mass. 545, 551. *Butterick Publishing Co.* v. *Fisher,* 203 Mass. 122, 129–130. The master found that the plaintiff had no monopoly in Massachusetts or elsewhere. Furthermore, it did not restrict Andelman to the purchase of its own products, but allowed him to purchase substantially all articles of wide sale and distribution in the business. Its entirely legitimate purpose was merely to protect its own good will and to preserve its dealer system by proscribing the sale by any dealer of unknown and possibly inferior brands of merchandise. As such it was not an unreasonable restraint at common law. "Under modern trade conditions a contract is not void at common law because it imposes restraint upon competition, unless that restraint is unreasonable, and tends to the prejudice of the public. When on considering the contract in the light of the business and situation of the parties and the circumstances with reference to which it was made, it

appears that the restraint contracted for is for an honest purpose, is only such as affords a fair protection to the legitimate interests of the party in whose favor it is imposed, and not so large as to interfere with the interests of the public, the restraint is held to be reasonable, and the contract valid." *Quincy Oil Co.* v. *Sylvester*, 238 Mass. 95, 97. Contracts containing similar provisions have been upheld in *Palmer* v. *Stebbins*, 3 Pick. 188, *Morse Twist Drill & Machinery Co.* v. *Morse*, 103 Mass. 73, *Butterick Publishing Co.* v. *Fisher*, 203 Mass. 122, *Atlantic Refining Co.* v. *Kelly*, 107 N. J. Eq. 27, 30, *Ferris* v. *American Brewing Co.* 155 Ind. 540, 543, *Standard Fashion Co.* v. *Siegel-Cooper Co.* 157 N. Y. 60, 66, and *Catt* v. *Tourle*, L. R. 4 Ch. 654. See Williston on Contracts (Rev. ed.) § 1645; Am. Law Inst. Restatement: Contracts, § 516 (e).

The price maintenance clause of the contract is valid. Agreements not to resell for less than the price fixed by the manufacturer have been held valid. *Garst* v. *Harris*, 177 Mass. 72. *Garst* v. *Charles*, 187 Mass. 144, 148–149. *Butterick Publishing Co.* v. *Fisher*, 203 Mass. 122.

Addressing our attention now to the plaintiff's chief grievance, the plaintiff complains of the continued use by Andelman of the name "Carroll Dealer" and the store front and merchandising methods originated and developed by the Carroll Company.

There was no error in forbidding Andelman to carry on as a "Carroll Dealer." It is highly improper that the public should be led to believe that it is dealing with a "Carroll Dealer" when in fact it is not. The conduct of Andelman in this case makes it an especially strong case for equitable relief. His use of an established name not his own could have but a single purpose — to gain illegitimately from the Carroll name and thus wrongfully enjoy the fruits of another's enterprise and expenditures. The court will grant equitable relief where the public may be deceived and the plaintiff's business appropriated. *Samuels* v. *Spitzer*, 177 Mass. 226. *C. A. Briggs Co.* v. *National Wafer Co.* 215 Mass. 100. *Hub Dress Manuf. Co.* v. *Rottenberg*, 237 Mass. 281. *Libby, McNeill & Libby* v. *Libby*, 241

Mass. 239. *Highland Dye Works, Inc.* v. *Anteblian,* 270 Mass. 209. *General Fruit Stores, Inc.* v. *Markarian,* 300 Mass. 90, 94–95, and cases cited. *Blair's Foodland Inc.* v. *Shuman's Foodland, Inc.* 311 Mass. 172. *Cain's Lobster House, Inc.* v. *Cain,* 312 Mass. 512. Am. Law Inst. Restatement: Torts, § 712. The gist of the offence consists of "such unfair conduct as is calculated to deceive the public into believing that the business of the wrongdoer is the business of him whose name, sign or mark is simulated or appropriated." *Ball* v. *Broadway Bazaar,* 194 N. Y. 429, 435–436. See *Stewarts Sandwiches, Inc.* v. *Seward's Cafeteria, Inc.* 60 Fed. (2d) 981, 982.

It was not proper to enjoin Andelman from the continued use of the Carroll type store front and colors minus the Carroll name, or to enjoin him from employing the Carroll merchandising methods. It is sufficient, as to the store front, if Andelman makes it clear that he is in no way connected with the Carroll Company or the plaintiff, and if he does not pass off his merchandise as merchandise generally offered for sale in Carroll stores. The merchandising methods are not and cannot be trade secrets, and consequently their use cannot be enjoined. See *Club Aluminum Co.* v. *Young,* 263 Mass. 223.

The plaintiff was awarded damages of $502.50 for the loss of profit on the purchases of merchandise which Andelman should have bought from the plaintiff during the months of September, October, November and December, 1941. The contract had been terminated just before this period on account of Andelman's breaches. The right to terminate had been vested in the plaintiff by the terms of the contract. Recovery of this item was proper. "The fundamental principle of law upon which damages for breach of contract are assessed is that the injured party shall be placed in the same position he would have been in, if the contract had been performed, so far as loss can be ascertained to have followed as a natural consequence and to have been within the contemplation of the parties as reasonable men as a probable result of the breach, and so far as compensation therefor in money can be computed by

rational methods upon a firm basis of facts." *John Hetherington & Sons, Ltd.* v. *William Firth Co.* 210 Mass. 8, 21. *Snelling* v. *Dine,* 270 Mass. 501, 506. *Bucholz* v. *Green Bros. Co.* 272 Mass. 49, 54. The master has found that, had the contract relations between the plaintiff and Andelman not been broken off because of Andelman's breaches, the plaintiff would have made profits of $502.50 on sales to Andelman. The plaintiff is entitled to recover that sum as a natural and probable consequence of Andelman's breaches. See Am. Law Inst. Restatement: Contracts, § 329.

The interlocutory decree overruling the demurrers of the defendants is reversed and instead an interlocutory decree is to be entered overruling the demurrer as to the defendant Andelman and sustaining the demurrer as to the defendant Miller. The interlocutory decree denying the defendants' motion to recommit the master's report, overruling the exceptions thereto and confirming the report is affirmed. The final decree is reversed and instead a final decree is to be entered dismissing the bill as to Miller with costs, but without prejudice to any rights of the plaintiff to bring an action at law for any outstanding obligations there may be due from the defendant Andelman to the plaintiff that are embraced within the terms of the defendant Miller's guaranty, and enjoining the defendant Andelman from using the name "Carroll" or the term "Carroll Dealer," from passing himself off as such or from representing that the wares in his store are goods generally offered for sale in Carroll or "Carroll Dealer" stores, and from making any representations either within or on the outside of his store tending to induce purchasers using ordinary care to trade with him in the belief that he is a "Carroll Dealer" or in some way connected with the Carroll Company or the plaintiff; and ordering the defendant Andelman to pay damages of $502.50, with interest from the date of the filing of the bill and costs in the court below and of this appeal.

*Ordered accordingly.*